1

2

3                              UNITED STATES DISTRICT COURT

4                           NORTHERN DISTRICT OF CALIFORNIA

5

6    JANET BACKMAN,                              Case No.  14-cv-05433-YGR

7                Plaintiff,                      ORDER GRANTING MOTION FOR JUDGMENT
                                                 IN FAVOR OF PLAINTIFF; GRANTING
8          v.                                    MOTION TO STRIKE

9    UNUM LIFE INSURANCE COMPANY OF              Re: Dkt. Nos. 22, 23, 26, 33, 38
     AMERICA,
10
                Defendant.

11         Presently before the Court is Plaintiff Janet Backman's ("Backman") appeal of the denial

12   by Defendant Unum Life Insurance Company of America ("Unum") of disability benefits under a

13   long term disability benefits plan covered by the Employee Retirement Income Security Act

14   ("ERISA"), 29 U.S.C. § 1001, *et seq.*  The parties filed cross-motions for judgment under Federal

15   Rule of Civil Procedure 52 (Dkt. Nos. 23 and 26), and the Court heard the parties' arguments on

16   March 29, 2016.

17         Having considered the parties' briefing, the administrative record[1] and other evidence

18   submitted,[2] and the arguments of the parties, the Court issues the following determination which

19   constitutes Findings of Fact and Conclusions of Law pursuant to Rule 52(a), and based thereon

20
     _____

21         [1] The administrative motion to seal the record (Dkt. No. 22) and the motion to seal the one-
     page errata to the record (Dkt. No. 38) are GRANTED.

22

23         [2] In addition to the administrative record offered by Unum, and the declaration of Denise
     Legendre of Unum authenticating it, Plaintiff's counsel submitted Plaintiffs' interrogatories and
24   responses thereto by Unum, as well as a chronology prepared by counsel.  Unum objected to and
     moved to strike the chronology.  Because the Court agrees that the chronology is not proper
25   evidence, the Motion to Strike is GRANTED.
           However, the Court notes that the administrative record contains multiple copies of
26   duplicative medical records and is not organized chronologically.  Where an administrative record
     is as voluminous and difficult to follow as the one here, it would behoove counsel in future
27   matters to make some effort to submit a more logically organized record, or to offer stipulated
     facts or an agreed chronology with cross-references to the record, to aid the finder of fact and
28   expedite resolution.

1  finds in favor of Plaintiff Janet Backman.

2  **I.   APPLICABLE LEGAL STANDARD**

3        Plaintiff appeals Unum's denial of benefits under ERISA, 29 U.S.C. section 1132(a)(1)(B),

4  otherwise known as section 502.  A beneficiary or plan participant may sue in federal court "to

5  recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the

6  plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. §

7  1132(a)(1)(B).  A claim of denial of benefits in an ERISA case "is to be reviewed under a *de novo*

8  standard unless the benefit plan gives the [plan's] administrator or fiduciary discretionary authority

9  to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber*

10 *Co. v. Bruch*, 489 U.S. 101, 115 (1989).

         The parties agree that the standard of review here is *de novo*.  On such a review, the court

12 conducts a bench trial on the record, and makes findings of fact and conclusions of law based upon

13 that record.  *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999) (bench trial may

14 "consist[] of no more than the trial judge reading [the administrative record].").  Plaintiff bears the

15 burden of establishing that she was disabled under the terms of the plan during the claim period by

16 a preponderance of the evidence.  *See Eisner v. The Prudential Ins. Co. of Am.*, 10 F.Supp.3d

17 1104, 1114 (N.D. Cal. 2014).  The Court finds that the administrative record here suffices and a

18 trial with live witness testimony is not necessary.

19 **II.   FACTS**

20      **A.      Backman's Employment**

21        Backman was employed by Crosscheck, Inc., for over 17 years as an accounting manager.

22 Backman's job required "[p]rocessing daily banking transactions revolving accounts receivable

23 and other accounting issues, reconciling daily and monthly bank accounts, preparing and posting

24 month end journal entries reconciling general ledger accounts, preparing daily and month-end [ ]

25 reports, and managing the daily activities of the accounting department." (AR 1235.)  Unum

26 conducted an occupational analysis of Backman's position which indicated that her job required:

27 "Sitting Constantly 6-8+ hours[;] Standing Occasionally (0-1 hr)[;] Walking Occasionally (0-1

28 hr)[;] Bending (waist) Occasionally (0-10 min)." (*Id.*)  The occupation analysis classified

United States District Court
Northern District of California

2

Backman's job as sedentary and stated that "[s]edentary work involves sitting most of the time, but may involve walking or standing for brief periods of time." (*Id.*) Unum's analysis further stated that sitting is "constantly" required in the job, meaning that the activity "exists 2/3 or more of the time (5.5+ hours a day in an 8-hour workday)." (AR 1238-39.) Backman's employer, Crosscheck, described her duties as including sitting "constantly 6-8+ hours." (AR 0091.) Backman stopped working September 26, 2011, due to severe low back pain and right-side radiculopathy, commonly referred to as sciatica.

### B. Long Term Disability Plan

Backman was covered by a group long term disability plan sponsored by Crosscheck under a policy with Unum ("the Plan"). The Plan provides, in part, as follows:

> **WHEN ARE YOU TOTALLY DISABLED?**
> ...
> For the first 27 months, you are totally disabled when, as a result of sickness or injury, you are unable to perform with reasonable continuity the substantial and material acts necessary to pursue your usual occupation in the usual and customary way.
>
> After benefits have been paid for 24 months of disability you are totally disabled when, as a result of sickness or injury, you are not able to engage with reasonable continuity in any occupation in you could reasonably be expected to perform satisfactorily in light of your age, education, training, experience, station in life, and physical and mental capacity.
> ...
> **ONCE PAYMENTS BEGIN MUST YOU CONTINUE TO BE UNDER THE REGULAR CARE OF A PHYSICIAN?**
> You must be under the regular care of a physician unless regular care:
> - will not improve your disabling condition(s); or
> - will not prevent a worsening of your disabling condition(s).

United States District Court
Northern District of California

1  (AR 0147, 0148.)[3]

2       Backman made a claim for long term disability benefits under the Plan on February 16,

3  2012.  (AR 0068.)  On her claim form, Backman reported that "it was painful to sit or stand for

4  prolonged periods of time" due to "pain in lower back [and] right leg."  (AR 0078.)

5       After reviewing Backman's medical records and claim information, and contacting the

6  doctors who had examined her, Unum determined that Backman was disabled and paid her

7  benefits under the Plan.  On April 18, 2012, Unum advised Backman that she was eligible to

8  receive Plan benefits, and determined that the date Backman's disability commenced was

9  September 26, 2011.  (AR 0514-18.)

10       On November 20, 2012, after receiving assistance filing a claim through a referral from

11  Unum (AR 0548, 0552), Backman was approved for Social Security Disability Insurance

12  ("SSDI") benefits by the Social Security Administration ("SSA"), with a September 26, 2011 date

13  of disability. (AR 0588.)

14       In January 2013, Backman was notified by Unum at that time that Unum "will apply

15  significant weight to the Social Security award of disability benefits."  (AR 0617.)  "Significant

16  weight means that the Social Security's judgment that you were disabled at the time of the award

17  will weigh heavily in your favor as we make ongoing disability determinations under your Long

18  Term Disability policy."  (AR 0617.)

---

19

20       [3] The Glossary section of the Plan states, in part:
   REGULAR CARE means:

21  -you personally visit a physician as frequently as is medically required, to effectively
   manage and treat your disabling condition(s); and

22  -you are receiving appropriate medical treatment and care for your disabling
   condition(s), which conforms with generally accepted medical standards.

23  ….

24  SUBSTANTIAL AND MATERIAL ACTS means the important tasks, functions and
   operations generally required by employers from those engaged in your usual

25  occupation that cannot be reasonable omitted or modified.
   In determining what substantial and material acts are necessary to pursue your usual

26  occupation, we will first look at the specific duties required by your Employer.  If
   you are unable to perform one or more of these duties with reasonable continuity, we

27  will then determine whether those duties are customarily required of other
   individuals engaged in your usual occupation….

28  (AR 0165, 0166.)

United States District Court
Northern District of California

Backman continued to receive Plan benefits until December 2013.  On December 16, 2013, Unum wrote to Backman and advised that it had determined she was no longer considered disabled from performing the material and substantial duties of her usual occupation and her benefits under the Plan were terminated.  (AR 1282.)  Backman submitted a series of appeals, providing new medical records and information from her treating physicians.  (AR 1305, 2001, 2037, 2043.)  Unum ultimately denied Backman's appeal as of July 14, 2014.  (AR 2136.)  In that final denial, Unum stated:

> We continue to conclude your report of pain and its limiting effects on your functional capacity are out of proportion to the clinical/diagnostic findings.  We have taken into consideration the minimal radiologic findings, lack of electrodiagnostic abnormalities supporting radiculopathy, and lower extremity strength described as within normal limits.
>
> Although L3-4 spondylolisthesis may explain your report of limited sitting ability, allowing postural changes (sitting to standing) 2-3 times per hour would not preclude all sitting.  This is consistent with SSA who concluded you had the functional capacity to sit for four hours per day.
>
> As previously communicated the occupation includes a variety of duties and independence to prioritize tasks and structure work activities to allow shifting weight and/or repositioning as needed for comfort.  It allows for occasional stand and stretch breaks, and supports the ability to avoid prolonged sitting with intermittent tasks requiring standing and walking.
>
> It would be appropriate in consideration of your reports of pain to limit lifting to 10-15 lbs and avoid bending/stooping/crawling.  These activities are not required in the performance of your usual occupation.

(AR 2138.)

### C.    Treatment and Claim History

#### 1.    Initial Determination of Disability

Backman had recurring low back pain and had received treatment for that pain before she took off from work in September 2011.  (*See* AR 0273, 1422.)  On September 23, 2011, Backman was seen by her regular primary care physician, Dr. Diana Prince. (AR 0259.)  Dr. Prince's diagnosis in the notes for that visit was "lumbar radiculopathy" with back pain radiating to her foot with pain and numbness, and a history of failed epidural injections.  (AR 0259.)  She was taken off work and referred for an MRI.  (AR 0259.)  On September 30, 2011, Backman had an

1    MRI which showed "facet joint hypertrophy at L2-3 and L3-4 and a probable disc fissure at L4-5."

2    (AR 0273.)

3         On October 7, 2011, Dr. Helen Shen Yee at Kaiser saw Plaintiff and added a possible

4    diagnosis of "arthropathy of facet joint." (AR 0263.)  Dr. Yee noted that Backman's MRI showed

5    degenerative changes in her facet joints bilaterally at L5-S1 in her low back.  (AR 0265.)  She also

6    noted that Backman's pain was worse sitting, that she "tolerates standing up to 10 minutes," and

7    the pain was better when she was supine.  (AR 0265.)  Dr. Yee discussed with Backman various

8    treatment options, including conservative pain management, a trial of facet injections, or referral

9    for surgery.  (AR 0266.)  She also prescribed a trial of a new medication, advised Backman to

10   continue with the home exercise program from physical therapy, and extended her time off work.

11   (AR 0266.)

12        In November 2011, Dr. Prince referred Backman to Kaiser's Chronic Pain Program, and

13   extended her time off work for the duration of that program, starting in December 2011 and

14   continuing through the end of February 2012.  (AR 0270, 0278-0288.)  She also referred Backman

15   to Dr. Jerald Gerst, in Kaiser's Occupational Medicine department, for an evaluation as to whether

16   her back pain was caused by her occupation for purposes of workers' compensation.  (AR 0270,

17   0273.)

18        Dr. Gerst performed his evaluation in January 2012.  (AR 0273.)  He noted "extensive

19   treatment through her primary care physician, Dr. Prince, with consultation with Helen Yee, MD

20   and a lumbar epidural corticosteroid injection by David Vidaurri, MD."  (AR 0275.)  He further

21   noted stiff and restricted movement in her torso, pain production upon seated straight leg raise,

22   and her MRI indicating facet joint hypertrophy and a probable disc fissure.  (AR 0275.)  His

23   diagnosis was chronic low back pain with right radicular pain, though he concluded that the

24   condition was not caused or aggravated by her work for purposes of workers' compensation.  (AR

25   0275-76.)  Dr. Gerst concluded that she "is near, or at, maximal medical improvement…[and] her

26   only therapeutic option, at this point, is to exercise her way out of pain."  (AR 0276.)  He

27   concurred that she should remain out of work.  (AR 0276.)

28        Backman made a claim for long term disability benefits under the Plan on February 16,

United States District Court
Northern District of California

2012.  (AR 0068.)  The claim, signed by Dr. Gerst, was based on chronic low back pain and lumbar radiculopathy.  (AR 0267.)  On her claim form, Backman reported that "it was painful to sit or stand for prolonged periods of time" due to "pain in lower back [and] right leg."  (AR 0078.)  Unum's notes of February 24, 2012, indicate that Backman "cannot sit for prolonged periods of time which is what [her] employment requires according to [her attending physician…and she] can only sit/walk two hours intermittently, and stand for one hour." (AR 0207.)

On March 5, 2012, Dr. David P. Suchard undertook a Qualified Medical Evaluation ("QME") of Backman for purposes of her workers' compensation claim.  (AR 0478.)  Dr. Suchard performed an in-person evaluation as well as a review of Backman's other medical records and prior imaging studies.  He determined that work aggravated Backman's condition and that she had "developed back pain with right sciatica and L5 radiculopathy."  (AR 0505.)  Dr. Suchard opined that she was unable to return to work at that juncture, with a "temporary partial disability precluding more than light lifting, bending, stooping, or twisting of the spine; and requiring ability to sit, stand, and move about as needed for comfort."  (AR 0506.)  He noted that she was taking two non-steroidal anti-inflammatory medications ("NSAIDs") and that she had been prescribed other medications but did not have a favorable response to them.  (AR 0479.)  He did not believe Backman's condition was yet at a maximum medical improvement or permanent and stationary status.  (AR 0505.)  He recommended authorization for a neurosurgical evaluation, EMG studies, and lumbar spine x-rays, plus treatment options such as "use of NSAID medications, guided active-exercise oriented physical therapy, consideration of additional lumbar corticosteroid injection, and/or right L5 selective nerve root block, and if clinical condition warrants even perhaps surgery." (AR 0505-06.)  On March 29, 2012, Backman had a new x-ray taken of her lumbar spine which showed: "moderate disc height loss L2-3 through L5-S1[;] associated endplate spurring and sclerosis[; and t]he L3-4 and L5-S1 facets appear degenerated/hypertrophied."  (AR 0484.)[4]  Backman was also referred to Kaiser's acupuncture department for treatment and received

_____

[4] Dr. Suchard's records of his March 5, 2012 evaluation, his March 26, 2012 "Supplemental agree panel QME Report," and the new lumbar spine x-ray all were provided to Unum prior to its initial determination of Backman's claim on April 18, 2012.  (AR 0471 [note showing entry date for Suchard's records was April 11, 2012].)

United States District Court
Northern District of California

treatments in April and May of 2012.  (AR 0413.)

As part of Unum's review of the claim, Unum's doctor, Dr. Szatalowicz, reviewed the file and came away with the impression that Backman might be well enough to return to work, so in early April 2012, he contacted Drs. Prince and Gerst to clarify their assessments.  (AR 0434-0446.)  Dr. Gerst confirmed that Backman had a disabling problem and that he did not believe that use of an ergonomic chair, a sit/stand table or any other accommodation would have allowed her to return to work at that time due to the severity of her pain.  (AR 0441-0442.)  Dr. Prince confirmed that she was continuing to provide off work notes to accommodate Backman's on-going medical evaluations, diagnostics, and therapy, including seeing a new occupational medicine doctor for her workers' compensation claim, but that she did not feel comfortable making a disability determination because it was "outside the scope of her practice."  (AR 0446.)  Dr. Szatalowicz ultimately concluded that the restrictions and limitations were supported based on the clarified information from Dr. Gerst, and suggested that Unum consider obtaining updated records in 4-6 months.  (AR 0465-66.)

After reviewing Backman's medical records and claim information, and contacting the doctors who had examined her, Unum determined that Backman was disabled and paid her benefits under the Plan.  On April 18, 2012, Unum advised Backman that she was eligible to receive Plan benefits, and determined that the date Backman's disability commenced was September 26, 2011.  (AR 0514-18.)

**2.      Examination and Treatment In Connection With Workers' Compensation Claim**

On May 3, 2012, at the referral of Dr. Suchard in his Workers' Compensation QME examination, Dr. Alan T. Hunstock, a neurosurgeon, examined Backman.  (AR 0683.)  Dr. Hunstock's evaluation noted that Backman "really should have a conservative treatment course initiated and has had virtually none so far," referring her for physical therapy for six weeks and a follow up at its conclusion.  (AR 0686.)  A May 21, 2012 note from Backman's doctor at Kaiser, Dr. Prince, indicated that the Workers' Compensation evaluation and physical therapy were through outside providers and that Backman was "awaiting authorization from W[orker's]

United States District Court
Northern District of California

1   C[ompensation] for the P[hysical] T[herapy]." (AR 0819.)  At that time, Dr. Prince also noted

2   Backman was "positive for myalgias and back pain" and has "decreased range of motion." (AR

3   0819.)

4       On June 8, 2012, Dr. Hunstock provided an opinion to Backman's employer, CrossCheck,

5   as to whether he believed she was disabled in any major life activity for purposes of state and

6   federal disability accommodation laws. (AR 0681.)  In that opinion, Dr. Hunstock stated that

7   Backman could only sit for 10 to 15 minutes before developing significant right leg pain, and had

8   some ongoing back pain with standing and walking. (AR 0681.)  He noted that he could not say

9   whether her impairment was permanent or temporary since she had not yet completed an adequate

10  course of treatment. (AR 0681-82.)  He noted that her main limitation on the job would be sitting

11  and that she "may need some accommodation for actually reclining or lying down periodically as

12  well…several times or more during the day." (AR 0681.)

13      In July of 2012, Backman reported to Unum that she was finally approved for physical

14  therapy through the workers' compensation system. (AR 0548.)  On September 19, 2012, Dr.

15  Suchard expressed concern, in a follow-up evaluation, that Backman only started physical therapy

16  "literally 4-1/2 months after I prescribed it.  I had given her significant restrictions on a return to

17  work date of 09/10/2012, but she has not completed her treatment at this point and still remains

18  quite symptomatic." (AR 1120.)[5]  He noted that Backman reported "about 30 minutes of standing

19  or sitting will cause her to develop severe pain radiating from the back into the right leg, primarily

20  down the anterior thigh toward the shin.  Even lying down after this does not resolve the

21  symptoms." (AR 1120.)  He further noted a "significant restriction in range of motion of the

22  back," and extended her restriction from returning to work until November 1, 2012. (AR 1120-

23  21.)  His treatment plan states that:

24          The patient will need to have adequate treatment rendered at this point, which
            would include an epidural steroid injection at L3-4 and will arrange this with Dr.
25          Botelho.  I will see her back after that is concluded and will address a return to

26  _____

27      [5]  Backman participated in physical therapy, as prescribed by Dr. Hunstock, from August
        28, 2012, to October 5, 2012. (AR 1110, 1112, 1114, 1116, 1118, 1122, 1124, 1126, 1129, 1132,
28      1134, 1138.)

United States District Court
Northern District of California

work if appropriate at that time. If she is not significantly improved, she would
need to give serious consideration to surgery at the L3-4 level for decompression
and fusion.

(AR 1120.)

On November 12, 2012, Plaintiff received an epidural steroid injection from Dr. Botelho.
(AR 1104.)  Dr. Botelho's follow up notes from the epidural indicate that Backman's functional
limitations are such that she can walk 20 minutes before having to stop, sit 30 minutes before
having to stand, and stand 30 minutes before having to sit, and that she frequently lays down due
to pain during the day.  (AR 0675.)  The follow-up at that time indicated the epidural resolved
some of her leg and back pain.  (AR 0674.)  His notes state:

Discussed treatment including continuing core strengthening on a regular basis to
help with lumbar support and reduce pain symptoms.  I will see her in a month
with continued conservative treatment and determine if facet blocks should be
done or if she improves.  I think she has two components to her pain a
neuropathic component which is improved and facet [joint] mediated pain which
is persistent.

(AR 0677.)

### 3.     SSA's Determination of Disability

On November 20, 2012, after receiving assistance filing a claim through a referral from
Unum (AR 0548, 0552), SSA approved Backman for Social Security Disability Insurance
("SSDI") benefits, with a September 26, 2011 date of disability.  (AR 0588.)  That approval was
based, in part, on an evaluation of Backman's residual functional capacity by Dr. Pong.  Dr.
Pong's evaluation concluded that Backman was limited to occasionally standing two hours or
sitting four hours "due to severe back pain [with] radiculopathy uncontrolled [with] failed epidural
injections.  Unable to sit long at all."  (AR 1316.)  In the portion of the evaluation concerning
inability to perform past jobs, Dr. Pong opined that Backman was "unable to do any work due also
to her inability to [sit or walk] any more than 2 hours" and her prior work "requires constant
sitting."  (AR 1316.)

In January 2013, Unum notified Backman that it would "apply significant weight to the
Social Security award of disability benefits."  (AR 0617.)  "Significant weight means that the
Social Security's judgment that you were disabled at the time of the award will weigh heavily in

United States District Court
Northern District of California

your favor as we make ongoing disability determinations under your Long Term Disability policy."  (AR 0617.)

### 4.      *Backman's Treatment in 2013*

On February 6, 2013, Dr. Prince completed a status update for Unum, stating that Backman was "unable to sit or stand without pain," "has failed all treatment plans[, and] uses pain medication sparingly."  (AR 0628.)

On April 18, 2013, Dr. Judith C. Heiler at Kaiser examined Backman due to a back pain flare up and gave her a Toradol injection.  (AR 0846.)  Dr. Heiler's notes indicate that Backman reported the pain was better while swimming on vacation in the Bahamas three weeks prior.  (AR 0846.)

On May 20, 2013, Dr. Suchard provided his opinion, based on his review of the medical records and treatment provided to that time, that Backman's condition was permanent and stationary ("P&S").  (AR 0718.)  His opinion of her work status was:

> Ms. Backman will be unable to return to the performance of her prior usual and customary work duties….She requires ability to sit, stand, and move about as needed for comfort, and I would advise preclusion of lifting of more than about 10 pounds as well as preclusion from bending, stooping, and twisting of the trunk.

(AR 0720.)  As to future medical care, Dr. Suchard opined that treatment should include: (1) continued use of NSAIDs with possible trials on alternative NSAIDs to see if any work better; (2) physical therapy in the event of flares or exacerbations unresponsive to self-care; (3) ongoing independent lumbar stabilization exercises; and (4) additional injections in the event of flares or exacerbations, with consideration to lumbar facet injections.  (AR 0720-21.)  He noted that "[t]he potential need for surgical intervention directed toward Ms. Backman's lumbar spine cannot be entirely excluded, but it is likely that a need for this appears relatively remote at this juncture."  (AR 0721.)  On July 23, 2013, Dr. Suchard reviewed additional records he was provided and reported that his opinion was unchanged from his May 20, 2013 P&S report.  (AR 709.)

In July 2013, Backman underwent surgery for an unrelated condition, an ovarian cyst.  (AR 0911 *et seq.*)  Other than this and some minor changes in medication, the record is silent as to any medical intervention or further analysis for Backman's back condition in the latter part of

2013 until after Backman received notice from Unum that it was terminating her benefits.  (AR 1282).  The record for the latter half of 2013 is mostly comprised of notes of Unum's nurses and claims specialists reviewing Backman's past records to determine whether she continued to meet the definition of disability under the Plan.

### 5.    Unum Terminates Backman's Benefits

Backman had received Plan benefits until, on December 16, 2013, when Unum advised Backman that it had determined she was no longer considered disabled from performing the material and substantial duties of her usual occupation and her benefits under the Plan were terminated.  (AR 1282.)  Backman submitted a series of appeals, providing new medical records and information from her treating physicians.  (AR 1305, 2001, 2037, 2043.)  Unum ultimately denied Backman's appeal as of July 14, 2014.  (AR 2136.)  In that final denial, Unum stated:

> We continue to conclude your report of pain and its limiting effects on your functional capacity are out of proportion to the clinical/diagnostic findings.  We have taken into consideration the minimal radiologic findings, lack of electrodiagnostic abnormalities supporting radiculopathy, and lower extremity strength described as within normal limits.
>
> Although L3-4 spondylolisthesis may explain your report of limited sitting ability, allowing postural changes (sitting to standing) 2-3 times per hour would not preclude all sitting.  This is consistent with SSA who concluded you had the functional capacity to sit for four hours per day.
>
> As previously communicated the occupation includes a variety of duties and independence to prioritize tasks and structure work activities to allow shifting weight and/or repositioning as needed for comfort.  It allows for occasional stand and stretch breaks, and supports the ability to avoid prolonged sitting with intermittent tasks requiring standing and walking.
>
> It would be appropriate in consideration of your reports of pain to limit lifting to 10-15 lbs and avoid bending/stooping/crawling.  These activities are not required in the performance of your usual occupation.

(AR 2138.)

### 6.    Medical Records Submitted After December 2013 Termination Decision

On December 18, 2013, shortly after the notice that Unum had terminated her benefits, Backman saw Dr. Prince, presenting with back pain and inability to sit or walk for more than 10-15 minutes and a need to lay down for 30 minutes per hour.  (AR 2045.)  Dr. Prince noted that

12

United States District Court
Northern District of California

1    Backman exhibited decreased range of motion and tenderness.  (AR 2046.)  Based on this, Dr.

2    Prince extended Backman's work modifications.  (*Id.*)

3           On February 14, 2014, Dr. Prince reported exacerbation of Backman's low back pain,

4    inability to sit or stand without pain for more than 10-15 minutes, and numbness and tingling in

5    her legs.  (AR 2047.)  Dr. Prince prescribed an additional Toradol injection, which Backman

6    received that day.  (AR 2047, 2050.)  Dr. Yee performed an additional evaluation on March 3,

7    2014, (AR 2055) and referred Backman for lumbar steroid injections/nerve blocks which she

8    received on April 2, 2014 (AR 2068, 2075).  Backman was then admitted to Kaiser's Chronic Pain

9    Program as of March 26, 2014.  (AR 2064.)

10          In April 2014, both Drs. Yee and Prince at Kaiser offered opinions that Backman was not

11   able to return to her job due to her inability to tolerate more than short periods of sitting or

12   standing without pain.  (AR 2107, 2108.)

13          In her notes regarding Backman's April 4, 2014 office visit, Dr. Prince states that Backman

14   "[w]as given modified [work duties] by [Workers' Compensation] doctor for outside eval[uation]

15   and I agreed to it without much thought."  (AR 2097.)  Dr. Prince further noted that Backman was

16   positive for back pain and exhibited decreased range of motion and tenderness.  (*Id.*)  Dr. Prince's

17   letter of April 4, 2014, stated:

18          "You are specifically unable to stand or sit for more than a few minutes in each
            position. You have not tolerated pain medicines to the point when you could
19          function taking them in the mental capacity required to drive or do your job. …
            my current assessment, as your treating physician, is that you are fully disabled
20          from your chronic back pain and cannot return to your job…."

21   (AR 2095.)

22          Backman had a new MRI on April 13, 2014, which indicated "mild foraminal[6]

23   encroachment on the right" at L3-4, along with broad based disc bulges at L1-2, L2-3, L3-4, and

24

25   _____

26          [6]  The intervertebral foramina are openings present between every pair of vertebrae in the
     cervical, thoracic, and lumbar spine.  A number of structures pass through the foramina including
27   the root of each spinal nerve, dorsal root ganglion, the spinal artery of the segmental artery,
     communicating veins, recurrent meningeal (sinu-vertebral) nerves, and transforaminal ligaments.
28   *See* https://en.wikipedia.org/wiki/Intervertebral_foramina, last visited June 7, 2016.

L4-5, and "a grade 1 spondylolisthesis[7] at L3-4." (AR 2099).  She thereafter saw Dr. Yee on April 22, 2014.  (AR 2104.)  Dr. Yee reviewed the MRI and noted that prior injections failed to improve her pain significantly.  (AR 2105.)  Dr. Yee further indicated that, although she could refer Backman for surgery, she was doubtful that surgery would be advisable "given multilevel degenerative changes and risk of transition syndrome if [Backman] has fusion [surgery]."  (AR 2105.)  Dr. Yee's letter, dated April 4, 2014, stated:

> "I have seen you for chronic low back pain related to multilevel lumbar disc degeneration and facet arthropathy.  You have not had significant improvement in pain or function with lumbar epidural steroid injections or physical therapy and other non-invasive management. You have been unable to tolerate short periods of sitting or standing well. I am in agreement with Dr. Prince's recommendation for being unable to return to your job due to your ongoing chronic low back pain given your limited functional tolerance."

(AR 2108.)  Backman also informed Unum that Kaiser had indicated they were "uncomfortable" treating her because she still had a pending Workers' Compensation claim and they did not consider her injuries to be caused by her work, so Kaiser could not treat her within the Workers' Compensation system.  (AR 2001.)

### D.    Unum's File Reviews Based on Backman's Internal Appeals

After her claim was denied, Backman submitted appeals and further information to Unum on several occasions. (*See* AR 1305, 2001, 2037, 2043.)  Based on these appeals, Unum's representatives conducted further reviews of her records.  Registered Nurse Brenda Nunn, on behalf of Unum, performed a records analysis dated February 17, 2014. (AR 1965.)  Nunn notes that Drs. Prince and Suchard saw Backman in 2013 (in July and May, respectively) and that Dr. Prince continued to provide medication management for Backman.  (AR 1966, 1968.)  Nunn opined that "[Backman's] limited treatment in 2013 would not be expected of one who reportedly has debilitating back pain to the extent she is unable to perform sitting activities with ability to stand or move about as needed for comfort."

Nunn's analysis contains a few statements about Backman's treatment history that are not

---

[7] Spondylolisthesis is the forward displacement of a vertebra. https://en.wikipedia.org/wiki/Spondylolisthesis, last visited June 7, 2016.

14

United States District Court
Northern District of California

consistent with the records.  First, Nunn indicated that that Backman "waited" five months before starting physical therapy, when in fact Workers' Compensation did not approve it for five months (*see* AR 0819).  Second, Nunn concluded that Backman had never participated in the spine alignment program although her records show she did (*see* AR 0392-0396, 0415, 0417).  Nunn also stated that "[t]here are no functional studies anywhere in the file to support" Backman's reports that "she could not sit for more than twenty minutes or stand for more than ten minutes at a time." (AR 1968.)  However, in the same review, Nunn noted that Dr. Pong had conducted a physical residual functional capacity ("RFC") analysis for purposes of Social Security (AR 1966), which found that Backman was able to stand and/or walk with normal breaks for a total of 2 hours per day and sit with normal breaks for a total of four hours per day.  (AR 1316.)  Dr. Pong's RFC concluded that Backman was "unable to do any work" due to her inability to stand or walk "any more than 2 hrs." and could not return to past relevant work "which all requires constant sitting." (AR 1319.)  Unum denied Backman's first appeal, essentially tracking verbatim Nunn's conclusions.

Backman appealed again, and forwarded the new April 2014 information from her providers, including their letters and records of the new MRI and nerve blocks she received.  Nunn then conducted another review.  (AR 2115.)  In Nunn's review of those new records, she stated:

> [a]dditional data received does not change my previous opinion in support of [the restrictions and limitations] of 'ability to sit, stand and move about as needed for comfort….'  Updated imaging studies of 4/14/14 MRI of lumbar spine still do not reveal any significant stenosis, foraminal encroachment or nerve root impingement.  Physical examination findings continue to provide normal to minimal findings: normal gait, intact sensation, full lumbar flexion, adequate or "ok" lumbar extension, deep tendon reflexes 1+ bilateral patellar and Achilles, negative straight leg raises, strength 5/5 and full hip range of motion in both lower extremities.  On exam, the insured did report increase[d] lower back pain when facets loaded to either side and tenderness to palpation over bilateral low back over L4-5 and L5-S1 facets.

(AR 2119.)  Because of the medical disagreement between Drs. Yee and Prince's new statement of limitations and the prior statement of limitations, Nunn referred the file for review by a Unum pain specialist.  (*Id.*)  The synopsis of the issue in Nunn's referral stated that Dr. Prince had given limitations that Backman "cannot sit for more than 15 mins, cannot stand for more than 10 mins,

1   has to lay down 20 mins per hour and walk 10 mins per hr.," but discounted this opinion as based

2   on Backman's report of her symptoms, "not based on changes to her condition." (AR 2125.)

3          On June 25, 2014, Unum's Dr. Andrew Krouskop completed a review of the clinical data

4   in the file, including Kaiser treatment notes from September 2010 to April 2014 from doctors,

5   social workers, and physical therapists who had worked with Backman, as well as notes of visits

6   and treatment with Drs. Botelho, Suchard, and Hunstock, Dr. Pong's RFC assessment from

7   November 8, 2012, and notes from Backman's physical therapy outside Kaiser. (AR 2125.)

8   Based on his review of these notes, Dr. Krouskop's file review concluded that Backman's

9   restrictions and limitations were not supported:

10          No treating [attending physician] has instituted a medication trial to see
     if various medications would be tolerated and successful in reducing her pain
11          complaints. Such a medication trial or the use of topical agents would be
     expected if the insured had impairing levels of pain.
12          As noted above, the insured's physical exam has not documented any
     persistent lower extremity weakness or any evidence of atrophy. One would
13          expect the development of focal muscle atrophy if the insured had a significant
     radiculopathy since her pain complaints have occurred for years. One might also
14          expect description of diffuse muscle atrophy if the insured were not maintaining
     regular activity, which would include daily walking.
15          Although, L3-4 spondylolisthesis may offer an explanation for her
16          limited sitting ability, allowing posture changes (sitting to standing) 2-3 times
     per hour would not preclude all sitting.
17          It is noted Social Security limited the insured to sitting 4 hours per day.
     However, with the use of a sit/stand workstation, allowing for multiple posture
18          changes, one could expect the insured could sit up to frequently, 2/3 of the day.

19   (AR 2128-2129.) Dr. Krouskop's review of prior MRI findings reports noted that the September

20   2011 MRI showed "a minimal Ll-2 broad-based disc bulge without evidence of neural foraminal

21   encroachment. No other levels in the lumbar spine exhibited neural foraminal encroachment."

22   (AR 2128.) He noted that the April 2014 MRI had "described disc bulges in the upper four

23   lumbar levels with L5-Sl listed as unremarkable…[and a] Grade I spondylolisthesis at L3-4 was

24   described but there was no report of central canal stenosis." (AR 2128, 2129.)

25          Dr. Krouskop concluded that, "[c]onsidering the minimal radiologic findings, no

26   electrodiagnostic abnormality, lower extremity strength generally described as within normal

27   limits, the insured's pain complaints are out of proportion to the clinical/diagnostic findings." (AR

28

United States District Court
Northern District of California

16

2129.)

**III.   ANALYSIS**

The Court reviews the evidence in the record *de novo* to determine whether Backman is disabled under the terms of the Plan.  "When conducting a de novo review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan."  *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290, 1295-96 (9th Cir. 2010); *see also Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (*en banc*) (a court employing *de novo* review "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits.").  Backman bears the burden of proof by a preponderance of the evidence, and the Court must evaluate the persuasiveness of the conflicting evidence to make its determination. *See Kearney*, 175 F.3d at 1094-95; *Eisner*, 10 F.Supp.3d at 1114.

Based upon an exhaustive review of the administrative record here, the Court finds that Backman has established that she was disabled under the Plan's definition of disability at the time her benefits were discontinued.  Backman was: "unable to perform with reasonable continuity the substantial and material acts necessary to pursue [her] usual occupation in the usual and customary way."  (AR 0147.)  Each of the doctors who examined Backman determined that she was unable to perform the duties of her sedentary job as an accounting manager.  They based their opinions on functional testing, x-rays, MRIs, and their own physical examinations of her.  Her condition was degenerative and did not show improvement prior to December 2013.  If anything, the medical records indicate that the condition of her lumbar spine declined, based on her April 2014 MRI results and the lack of significant pain reduction after initiating a course of facet injections in April 2014.

The Court finds significant the fact that Unum initially determined Backman to be disabled based on her examining doctors' opinions.  It was only after receiving benefits covering the period from September 2011 to December 2013 that Unum decided Backman was no longer disabled.  Unum's proffered reasons for terminating Backman's benefits were that she had not sought significant treatment or additional diagnostic testing in 2013, but had only continued with pain

management on the same medications, utilizing the same stretching and exercise regime as before, and getting only one injection for flare up pain in April 2013.[8]  Unum concluded that her reports of pain and its limits on her functioning were "out of proportion" to the information in her medical records.

A number of factors undermine the foundation for Unum's decision that Backman was no longer disabled.  The Court considers each in turn.

### A.   Favoring In-House Consultants' Opinions Over Examining Physicians' Opinions

First, Unum's decision relied on the opinions of its own consultants rather than the physicians who examined and treated Backman.  Unum's in-house medical consultants only reviewed the records of other doctors and medical testing.  While ERISA does not accord special deference to the opinions of a treating physician, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003) (ERISA does not import treating physician rule from Social Security regulations), courts generally give greater weight to doctors who have actually examined the claimant versus those who only review the file, especially when they are employed by the insurer as here.  *See Eisner*, 10 F.Supp.3d at 1115; *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011); *Minton v. Deloitte & Touche USA LLP Plan*, 631 F.Supp.2d 1213, 1219-20 (N.D.Cal. 2009); *Heinrich v. Prudential Ins. Co. of Am.*, No. C 04-02943 JF, 2005 WL 1868179, at *8 (N.D. Cal. July 29, 2005) (failure of administrator's physicians to examine claimant entitles their opinions to less weight than treating physicians since the nature of the condition at issue produces symptoms that must be evaluated through in-person examination); *see also Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 167 (6th Cir. 2007) (reliance on file reviewers rather than actual physical examination may "raise questions about the thoroughness and accuracy of the benefits determination").

---

[8] Unum's notes and letters regarding denial of benefits repeatedly focus on the fact that Backman took a vacation to the Bahamas in March 2013, which Unum's consultants interpreted as meaning she was not as limited as she stated.  (AR 1232, 1968, 1979, 1981, 2127.)  Taking a vacation—particularly when Backman reported that it was a "mistake" and caused a flare up that required an injection of pain medicine in April 2013 (AR 2003, 2004)—is not enough, by itself, to warrant a finding that Backman was no longer disabled.

The evidence from every doctor who examined Backman was that she was unable to return to work due to her condition.  In January 2012, Dr. Gerst thoroughly examined Backman and confirmed that she was unable to work.  (AR 0273.)  He opined that a sit/stand table or other accommodation would not allow her to return to work based on his objective findings of "lower lumbosacral tenderness and a positive seated straight leg raise test."  (*Id*.)  Dr. Hunstock's June 2012 opinion was that Backman could only sit for 10 to 15 minutes before developing significant right leg pain, had pain standing and walking, and "may need some accommodation for actually reclining or lying down periodically as well…several times or more during the day."  (AR 0681.)  Dr. Pong's November 2012 evaluation was that she did not have the functional capacity to return to her sedentary work.  (AR 1316.)  Dr. Suchard's May 2013 opinion was that Backman could not return to her sedentary job given the limitations of needing to "sit, stand, and move about as needed for comfort."  (AR 0720.)  And Drs. Prince and Yee each opined, before and after December 2013, Backman was unable to work.

**B.     Insisting on Additional Diagnostic Evidence and Examinations to Establish Continuing Disability**

In terminating Backman's benefits, Unum's consultants reasoned that if she were truly disabled, she would have had more treatment in 2013.  The consultants' opinions ignore that fact that her course of treatment in 2013 was exactly as Dr. Suchard suggested it should be.  Unum faults Backman for not visiting the doctor for treatment more often in 2013, yet she had already been determined to be "permanent and stationary" in her condition by Dr. Suchard, and apparently continued the same sort of pain management regimen as she had in the past during 2013.  The Plan itself states that, once payments begin, the claimant must receive regular care from a physician *unless* it "will not improve your disabling condition(s); or will not prevent a worsening of your disabling condition(s)."  (AR 0148.)  Here, no provider has suggested, either before or after Backman's benefits were discontinued, that there was any care that would have improved her condition or prevented worsening of her condition.  Thus, under the terms of the policy, Backman was not required to receive regular care in order to continue meeting the definition of totally disabled.  To the contrary, Dr. Suchard's opinions regarding future treatment were simply that

1    Backman: (1) continue to use NSAIDs, possibly trying alternative NSAIDs to see if any work

2    better; (2) physical therapy if she experienced flares or exacerbations unresponsive to self-care; (3)

3    ongoing independent lumbar stabilization exercises; and (4) additional injections in case of flares

4    or exacerbations, including the possibility of lumbar facet injections.  (AR 0720-21.)  Surgery or

5    other more aggressive treatment was not recommended.  (*Id.*)

6              **C.      Overlooking Records That Conflicted With Unum's Conclusions**

7              Unum overlooked records that did not agree with its consultants' conclusions.  With

8    respect to the SSA file, even after Unum finally obtained it, Unum's consultant (Nunn) still

9    insisted that no functional studies supported Backman's limitations.  This conclusion ignored the

10   Social Security residual functional capacity determination conducted by Dr. Pong in the SSA

11   process.  Nunn concluded that Backman had never participated in the prescribed spine alignment

12   program, contrary to the records showing that she did. (AR0392, 0402.)  And Nunn's

13   characterization of Backman as delaying participation in physical therapy for months ignored

14   evidence that the delay was due to a five month wait for approval by the Workers' Compensation

15   system, not any avoidance by Backman.

16             Similarly, Dr. Krouskop overlooked or disregarded records to reach his conclusions.  He

17   indicated in his opinion that, although Dr. Pong had limited Backman to four hours a day of

18   sitting, "with the use of a sit/stand workstation, allowing for multiple posture changes, one could

19   expect the insured could sit up to frequently, 2/3 of the day." (AR 2129.)  This opinion was in

20   direct conflict with: (1) Unum's own assessment that Backman's job required "constantly sitting,

21   *i.e.,* 2/3 or more of the time" (AR 1238-39); (2) Crosscheck's statement that her duties required

22   sitting "constantly 6-8+ hours" per day (AR 0091); (3) SSA's decision that she was limited to

23   "sit[ting] (with normal breaks) for a total of 4 hours" (AR 1316); (4) and Dr. Gerst's earlier

24   opinion that, with essentially the same symptoms and limitations, the severity of her pain "would

25   not have permitted her to return to work at that time even with an ergonomic chair and sit/stand

26   table."  (AR 434.)  Notably, none of Unum's experts addressed whether Backman could perform

27   the duties of her usual occupation "in the usual and customary way" if she needed to lie down

28   periodically throughout the day, as several of Backman's examining doctors indicated.  (AR 0675,

United States District Court
Northern District of California

20

1    0681, 1120, 1308.)

2        Unum also disregarded additional information provided after its initial December 2013

3 decision to terminate benefits, despite directing Backman to submit new evidence for its

4 consideration.  The records submitted showed that Dr. Yee performed an additional evaluation

5 March 3, 2014, (AR 2055) and referred Backman for lumbar steroid injections/nerve blocks which

6 she received on April 2, 2014 (AR 2068, 2075).  Backman was admitted to Kaiser's Chronic Pain

7 Program as of March 26, 2014.  (AR 2064.)  In April 2014, both Drs. Yee and Prince concluded

8 that Backman was not able to return to her job because of pain when sitting and standing.  (AR

9 2107, 2108.)  Backman's MRI in April 2014 showed "diffused hypertrophic spurring and disc

10 space narrowing," as well as "increased L3-4 disc degeneration…[and s]lightly increased facet

11 joint fluid" at L4-5.  (AR 2103.)  Backman's trial of lumbar facet nerve block injections in April

12 2014 did not produce significant improvement in her pain.  (AR 2105.)

13        Despite this evidence, Unum's consultant Dr. Krouskop indicated that Backman had

14 improved.  Dr. Krouskop indicated that Backman's September 2011 MRI showed "a minimal Ll-2

15 broad-based disc bulge without evidence of neural foraminal encroachment.  No other levels in the

16 lumbar spine exhibited neural foraminal encroachment."  (AR 2128.)  Yet his summary omitted

17 that the April 2014 MRI that it showed "mild foraminal encroachment on the right" at L3-4.  (AR

18 2099.)  He noted that the April 2014 MRI "described disc bulges in the upper four lumbar

19 levels…[and a] Grade I spondylolisthesis at L3-4" but minimized that finding, stating "but there

20 was no report of central canal stenosis." (AR 2128, 2129.)  In short, a simple comparison of the

21 2011 and 2014 MRI findings suggests progression from no encroachment to mild encroachment in

22 the foraminal spaces.  Yet, despite this MRI evidence and Backman's treating doctors finding

23 continued disability, Dr. Krouskop found improvement in Backman's condition and no continuing

24 disability.

25        Indeed, the statement Unum seized upon in its decision to terminate her disability

26 benefits—Dr. Prince's checkmark on a faxed Unum form answering "yes" to the question of

27 whether she agreed that one sentence from Dr. Suchard's opinion meant Backman could return to

28 work full time—was immediately withdrawn by Dr. Prince.  (AR 1308 [work status report of

United States District Court
Northern District of California

21

1    12/18/13].)  Unum's December 4, 2013 fax to Dr. Prince extracted a single sentence from Dr.

2    Suchard's report, listing Backman's functional limitations but omitting Suchard's opinion that

3    Backman could not return to work due to her disability.  (AR 1251, *cf.* AR 720 [P&S Report]).

4    Without that context, Unum asked Dr. Prince to state a simple "yes" or "no" as to whether she

5    believed those limitations would allow Backman to return to full-time work.  Dr. Prince had

6    already informed Unum that she was not comfortable providing opinions about disability and

7    limitations because it was outside her specialty.  (AR 0446.)  After examining Backman herself on

8    December 18, 2013, Dr. Prince gave the opinion that Backman "[c]annot sit for more than 15

9    minutes cannot stand for more than 10 minutes[; h]as to lay down 20 minutes per hour and walk

10   10 minutes per hour."  (AR 1308.)  As Dr. Prince later explained regarding the faxed statement,

11   she "was in error that [she] assumed [Backman] could return to work full-time in December,

12   2013."  (AR 2107.)  In her notes regarding Backman's April 4, 2014 office visit, Dr. Prince states

13   that she "agreed to it without much thought."  (AR 2097.)  Whatever else can be said about

14   Unum's actions in asking Dr. Prince to agree to an incomplete statement of Dr. Suchard's opinion,

15   it is not evidence that Backman could return to her sedentary job.

**D.      Dismissing Evidence of Pain As Merely Subjective and Therefore Unreliable**

16          Unum dismissed the opinions of Backman's treating doctors on the basis that they were

17   merely restating her subjective symptoms, not based on objective evidence.  Unum's rejection on

18   these grounds overlooks the objective evidence in the record, such as the bulging, spurring, and

19   disc space narrowing in her spine shown in her April 2014 MRI, as well as objective evidence of

20   decreased range of motion and lumbar tenderness.[9]  Moreover, the Ninth Circuit has held that "the

21   lack of objective physical findings" is insufficient to justify denial of disability benefits for

22   conditions that lack objective physical evidence.  *See Salomaa,* 642 F.3d at 669; *Saffon v. Wells*

23   *Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 872 (9th Cir. 2008) (criticizing Plan's

24   denial of benefits for lack of objective evidence of pain since it is inherently subjective); *Benecke*

25

26          [9]  There was also objective evidence of a positive "straight leg test" and MRI results
     indicating "mild foraminal encroachment on the right" at L3-4 per 4/13/14 in MRI, broad based
27   disc bulges at L1-2, L2-3, L3-4, and L4-5, and "a grade 1 spondylolisthesis at L3-4." (AR 0273,
     2099.)
28

United States District Court
Northern District of California

*v. Barnhart,* 379 F.3d 587, 590 (9th Cir. 2004) (ALJ committed legal error in discounting claimant's pain testimony and opinions of physicians based on pain reports).  Given the lack of an objective test to confirm the level of pain that a person is experiencing, denying a claim based on a lack of objective evidence of pain is an abuse of discretion.  *See Saffon*, 522 F.3d at 872 ("individual reactions to pain are subjective and not easily determined by reference to objective measurements"); *Nolan v. Heald College*, 745 F.Supp.2d 916, 936 (N.D. Cal. 2010) ("because Nolan's pain resulting from the radiculopathy cannot be quantified by objective measurements, it was an abuse of discretion for MetLife to so require, and its decision cannot stand as a result."); *see also Salomaa*, 642 F.3d at 678 (with respect to fibromyalgia, "conditioning an award on the existence of evidence that cannot exist is arbitrary and capricious"); *James v. AT & T W. Disability Benefits Program*, 41 F.Supp.3d 849, 879-80 (N.D. Cal. 2014) ("[a] plan's denial is 'arbitrary to the extent that it was based on [a consulting physician's] implicit rejection of [a] Plaintiff's subjective complaints of pain'") (*quoting May v. AT & T Umbrella Ben. Plan No. 1*, No. C-11-02204 JCS, 2012 WL 1997810, at *17 (N.D. Cal. June 4, 2012), *aff'd*, 584 F. App'x 674 (9th Cir. 2014).)  Backman's reports of pain, though subjective, were supported by her physicians' examinations and test results.

      **E.**     **Terminating Benefits Despite a Lack of Evidence of a Change In Condition**

      Unum's justification for the 2013 termination of Backman's benefits is further undermined by its initial 2012 disability determination, which included subjective reports of pain that were essentially unchanged at the time of the termination.  As in *Nolan*, the Plan here paid benefits for two years before determining that plaintiff was no longer disabled by her radiculopathy and back pain.  Even under the more deferential standard that applied in *Nolan*, the reviewing court there concluded it was not proper for the Plan to find the medical evidence was sufficiently objective proof for an *initial* award of benefits only to require "more objective" evidence of pain to avoid termination of those benefits.  *Nolan*, 745 F.Supp.2d at 936.  And, as in *Nolan*, the Plan's termination of benefits appears particularly inappropriate given the lack of evidence suggesting that the claimant's pain had improved or her admittedly degenerative condition had reversed course.  *Id.*  Though there are conclusory statements in the Unum consultants' notes to the effect

United States District Court
Northern District of California

that Backman's condition had improved since the disability determination, the Court's review of the evidence does not support that conclusion.  While Unum is not held to a particular standard to show changed conditions, the credibility of its consultants' conclusions to terminate benefits are undermined when there is no evidence of improvement.  *Saffon,* 522 F.3d at 871 ("In order to find her no longer disabled, one would expect the MRIs to show an improvement, not a lack of degeneration."); *Schramm v. CNA Fin. Corp. Insured Grp. Ben. Program*, 718 F. Supp. 2d 1151, 1164-65 (N.D. Cal. 2010) ("Although Defendant did not need to prove a material improvement in Plaintiff's condition to defeat her entitlement to benefits, her lack of consistent, marked progress is probative of her continuing disability.")

### F.        Inappropriately Discounting SSA Disability Determination

Further undermining Unum's termination of benefits is the Social Security Administration's determination that she was disabled.  Unum indicated that it would give the SSA decision substantial weight in a disability determination, yet discounted the SSA determination on the grounds that subsequent records showed Backman had improved.  In its December 2013 denial determination, Unum said that its decision differed from the Social Security Administration's because it had additional information that Social Security did not have at the time of its November 2012 determination, specifically examinations by Backman's Workers Compensation physicians, including Dr. Suchard's July 23, 2013 follow-up to his permanent and stationary assessment.  (AR 1283.)  The credibility of this assertion is undercut by the fact that Unum had not obtained the SSA file at the time of the original denial in December 2013.  (AR 1283.)[10]

Further, Unum's efforts to distinguish the SSA disability determination are contradicted by the record.  Dr. Suchard's May 2013 Permanent and Stationary report (AR 0711) indicated the identical limitations as stated in his Qualified Medical Evaluation report of March 2012, which SSDI reviewed in its determination.  (AR 0738, duplicate in file, part of SSDI file at AR 1564 and AR 1769).  Backman's work status restrictions and limitations were unchanged in the subsequent reports Dr. Suchard provided in April 2012 and May 2012, which SSDI also included in its

---

[10]  Because Unum had been unable to do so, Backman obtained and submitted to Unum a copy of the SSA file in January 2014. (AR 1357, 1360 *et seq.*)

evaluation.  (*See* AR 1563 [copy of Suchard's reports]).  Dr. Suchard's follow up on July 23, 2013 (signed August 8, 2013) said that his opinion was unchanged.  (AR 0709.)  Thus, nothing in Dr. Suchard's July 2013 report would have changed the SSDI determination.

Unum's later reviews of the record took into account the contents of the SSA file, but continued to conclude that the restrictions and limitations listed in Dr. Suchard's report, along with Dr. Prince's fax form agreement, were entitled to greater weight than either SSA's or Dr. Suchard's conclusion that she was disabled from her usual occupation.  (AR 1975.)  Despite informing Backman that she must submit new examinations and findings in order for the Unum to reconsider its decision, and Backman doing so, Unum persisted in its determination that Backman was able to work.

### G.     Conclusion

The Ninth Circuit has cautioned that "complete disregard for a contrary conclusion without so much as an explanation raises questions about whether an adverse benefits determination was 'the product of a principled and deliberate reasoning process.'" *Salomaa*, 642 F.3d at 679 n. 35; *see also Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 635 (9th Cir. 2009).  Here, Unum maintained its opinion that Backman's pain was out of proportion to the clinical and diagnostic findings in the record, despite contrary conclusions from her treating physicians, with little credible explanation for why it dismissed those conclusions.  Unum's consultants determined that Backman's pain was not as debilitating as the limitations stated in the examining physicians' records.  They did this despite the fact that all the doctors who examined her determined that her condition made her unable to perform her job.  No examining doctor suggests Backman's pain was not as great as she stated, that the degenerative changes in her spine improved over time, or that her reticence to take stronger or more pain medication indicated that her reported pain was not credible.

### IV.     DISPOSITION

Upon *de novo* review of the record, the Court finds that Plaintiff continued to be disabled within the meaning of the LTD Plan as of December 2013, and was entitled to have the Plan disability benefits continue.

United States District Court
Northern District of California

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

The parties shall, within thirty days of the date of this Order: (1) meet and confer to resolve the amount of disability benefits due Plaintiff, and (2) submit a proposed judgment consistent with the terms of this Order.

This terminates Docket Nos. 22, 23, 26, 33, and 38.

**IT IS SO ORDERED.**

Dated: June 8, 2016

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT JUDGE**